UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ANA MARIA MEJIA, by her legal guardian
GENRRI DANIEL MORALES, and GENRRI
DANIEL MORALES, her husband, individually
and on behalf of their minor children,

                Plaintiffs,                         13-cv-01789 (NSR)
     -against-                                  OPINION AND ORDER

THE UNITED STATES OF AMERICA, and
ORANGE REGIONAL MEDICAL CENTER,

                Defendants.
-----------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge

      Plaintiffs Ana Maria Mejia (by her legal guardian) and Genrri Daniel Morales ("Plaintiffs") commenced this action against the United States of America and Orange Regional Medical Center for claims of medical malpractice during Mrs. Mejia's treatment in April of 2011. Mrs. Mejia was, in part, treated by the Middletown Community Health Center, which is a Federally Qualified Health Center. Before the Court are two motions filed by Defendant United States of America (the "Government"). The first motion seeks to dismiss all claims arising from events of April 19, 2011, based on lack of subject matter jurisdiction. The second motion seeks summary judgment on the remainder of Plaintiffs' claims. For the following reasons, the motion to dismiss for lack of subject matter jurisdiction is DENIED, and the summary judgment motion is GRANTED in part and DENIED in part.

1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: Aug 31, 2016

## FACTUAL BACKGROUND

On April 18, 2011, Mrs. Mejia underwent tubal ligation surgery at Orange Regional Medical Center ("ORMC"), which was performed by Dr. Christopher Allen, an employee of the Middletown Community Health Center ("MCHC").[1] (Declaration of Caleb Hayes-Deats,[2] ECF No. 62, Exhibit C at 1.) Prior to undergoing surgery, Mrs. Mejia signed an informed consent form authorizing Dr. Allen to perform the tubal ligation procedure and acknowledging that she had "been fully informed of ... complications ... and the possible risks that might arise." (Exhibit 33.) After surgery, Mrs. Mejia was discharged the same day with instructions to call the doctor if she experiences "an increase in temperature (greater than 101), unrelieved pain, or symptoms that are not relieved by, worsening, or side effects of medications." (Exhibit 11 at 316.)

The next day—April 19, 2011—Mrs. Mejia awoke with a fever and abdominal pain. (Exhibit 13.) The parties dispute whether Mrs. Mejia contacted MCHC on April 19 to seek medical advice as to her continued pain and fever. Mrs. Mejia alleges that her roommate, Ms. Maria Clementina Gomez, telephoned MCHC on her behalf, and Ms. Gomez confirms this in her deposition and affidavit. (Exhibit 1 at 1-2; Exhibit L at 28-29.) However, Dr. Allen has no knowledge of any alleged call by Mrs. Mejia on April 19, 2011, (Ex. H at 400, 413-14), and Defendants' call logs do not contain any such call from Ms. Gomez or Mrs. Mejia. (Exhibits P and Q.) In addition, receptionists employed at MCHC provided conflicting testimony as to

---

[1] ORMC is a hospital, and MCHC is a health clinic. Accordingly, ORMC has facilities that MCHC lacks, such as operating rooms and an emergency room. As a result, MCHC doctors such as Dr. Allen and Dr. Brady routinely provide services to MCHC patients at ORMC.

[2] Lettered exhibits are exhibits to the Declaration of Caleb Hayes-Deats, ECF No. 62. Numbered exhibits are exhibits to the Declaration of David C. Cook, ECF No. 66.

whether an emergency call of this type would be documented in the communication log. (Exhibit 29 at 20-25; Exhibit O at 53.) Generally, if a patient calls MCHC with an emergency, the receptionist transfers the call to a nurse or doctor, as the receptionists are not permitted to give medical advice. (Exhibit 29 at 20-25; Exhibit O at 52.) When asked how she would react if a patient called indicating she had a tubal ligation the day before, each of two MCHC receptionists provided different answers. Ms. Marisol Barera testified that she would connect the patient to a nurse or doctor directly and would not record a message but would expect the nurse or doctor to do so. (Exhibit K at 22-24, 27.) On the other hand, Ms. Merida Reyes testified that, in these circumstances, she would take a handwritten message. (Exhibit O at 105.)

On the morning of April 20, 2011, Mrs. Mejia's husband—Mr. Genrri Morales—was running an errand with Mrs. Mejia's friend—Ms. Aurora Asencio—when they drove by MCHC and encountered Dr. Allen in the parking lot. (Exhibit N at 14-15.) Dr. Allen instructed them to take Mrs. Mejia to the emergency room. (*Id.*) Mrs. Mejia was then brought to the ORMC emergency room and was tachycardic, had a fever, had abdominal pain, and was in septic shock. (Exhibit 8 at 5-6; Exhibit D at 211.) Dr. Allen, Dr. Brady, and Dr. Mayefsky, performed an exploratory laparotomy with drainage of intra-abdominal peritoneal fluid and a left salpingo-oophorectomy. (Exhibit D at 211.) Mrs. Mejia was then transferred to the Intensive Care Unit, where she remained tachycardic. (Exhibit 5 at 12.) Mrs. Mejia's cervical culture on April 20 tested positive for streptococcus pyogenes (Group A strep). (Exhibit 9 at 2310.) At some point on April 20, Dr. Allen wrote Mrs. Mejia a prescription for Keflex, which is used to treat infections such as Group A strep, but the prescription was never given to Mrs. Mejia, and Dr. Allen does not recall writing it. (Exhibit 14-15; Exhibit 11 at 401-02.) When Mrs. Mejia began to wake up from anesthesia, she went into cardiac arrest, was resuscitated, and thereafter remained

3

unresponsive. (*Id.*) Mrs. Mejia suffered from Group A Strep Toxic Shock Syndrome, among other ailments and was completely comatose. (*Id.*) As a result, Mrs. Mejia currently suffers and will continue to suffer total paralysis and "locked in syndrome," where she is fully aware of her condition but is unable to speak or move. (Complaint, ECF No. 1, ¶ 24.)

On February 3, 2012, Plaintiffs filed administrative claims with the Department of Health and Human Services ("DHHS") on Standard Form 95s ("SF95s"). (Exhibit A.) On the SF95s, Plaintiffs describe the bases of their claims:

> On or about April 18, 2011, Dr. Christopher Allen, an employee and/or agent of MCHC, performed a tubal ligation on Mejia. ... On or about April 20, 2011, while in the continuing care of Dr. Allen, Mejia suffered from worsening pain and returned to Dr. Allen for medical treatment. The same day, Mejia was rushed to the emergency room of Orange Regional Medical Center with complaints of abdominal pain and fever. She then underwent an emergency surgery, apparently suffering from toxic shock as a result of the tubal ligation. Following complications during surgery, Mejia's condition substantially worsened and in the subsequent days she lost substantial cognitive function. At that point, Mejia was placed on life support.

(*Id.*) On February 9, 2012, DHHS' Office of General Counsel replied to Plaintiffs' complaints via letter "acknowledg[ing] receipt of [Plaintiffs'] claims (2) relating to personal injury to Ana Maria Mejia as the result of medical treatment rendered Mrs. Mejia on April 18, 2011 during and after a tubal ligation performed by an employee of [MCHC]" and requesting Mrs. Mejia's ORMC hospital records as well as "[a]ny other evidence or information which may have a bearing on the health center and/or the employees involved for the injuries claimed." (Exhibit 6.) On July 3, 2012, Plaintiffs' counsel sent DHHS 2,600 pages of medical records relating to Mrs. Mejia's medical treatment. (Exhibit C.) On September 17, 2012, DHHS denied Plaintiffs' administrative claims, indicating that it understood Plaintiffs' claims to allege, "*inter alia,* that an

4

employee of the [MCHC] negligently performed a tubal ligation on Ana Maria Mejia, on April 18, 2011." (Exhibit E.) DHHS explained that it had concluded that no negligence had in fact occurred. (*Id.*)

## RELEVANT STANDARDS OF REVIEW

*I.    Standard on a Motion to Dismiss for Lack of Subject Matter Jurisdiction*

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). In assessing whether there is subject matter jurisdiction, the Court must accept as true all material facts alleged in the complaint, *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009), but "the court may resolve [any] disputed jurisdictional fact issues by referring to evidence outside of the pleadings." *Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).

*II.    Standard on a Motion for Summary Judgment*

Rule 56 of the Federal Rules of Civil Procedure provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by

5

"showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks omitted). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250.

Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted). Moreover, "[a non-

6

moving party's] self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Cv. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) *aff'd*, 604 F.3d 712 (2d Cir. 2010) (citing *Gonzales v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003)).

## DISCUSSION

Plaintiffs—by their own admission—limit their remaining claims against the Government to the following: (1) failure of MCHC to provide medically proper advice to Plaintiff Mejia's complaints of high fever and severe pain on April 19, 2011; (2) lack of informed consent in failing to warn of the risk of life-threatening infection as a result of the elective non-emergent tubal ligation; and (3) negligent exposure to Group A strep. (Memorandum of Law in Opposition to the Motion of the United States for Summary Judgment and to Dismiss for Lack of Subject-Matter Jurisdiction ("Pls.' Opposition"), ECF No. 63, at 1.)

*I. Subject-Matter Jurisdiction over Claims Stemming from Alleged Call on April 19, 2014*

It is well settled that the principle of sovereign immunity shields the United States from being sued without its consent and that "the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 564 U.S. 206, 212 (1983). *See also FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *Adeleke v. United States*, 355 F.3d 144, 150 (2d Cir. 2004). In the Federal Tort Claims Act ("FTCA"), Congress waived sovereign immunity for suits arising from injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of [her] office or employment." 28 U.S.C. § 1346(b)(1). A suit against the United States is the exclusive remedy for a suit for damages for such injury or loss of property. 28 U.S.C. § 2679(b)(1).

7

"Before an action may be filed under the [FTCA], an administrative claim must be presented to the federal agency employing the person whose act or omission caused the injury." *Valdez v. United States*, No. 08-cv-4424, 2009 WL 2365549, at *5, n.7 (S.D.N.Y. July 31, 2009). "Presentation of an administrative claim to the appropriate agency is a jurisdictional prerequisite to suit." *Id.* (citing 28. U.S.C. § 2675(a) ("An action shall not be instituted upon a claim against the United States . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by . . . mail.")). The administrative exhaustion requirement is "jurisdictional and cannot be waived." *Celestine*, 403 F.3d at 82 (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994)). Accordingly, the FTCA requires a plaintiff to exhaust administrative remedies before filing suit. *See Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005).

In this case, the parties disagree as to the relevant standard for the exhaustion requirement: Plaintiffs contend only "skeletal" notice is required, (Pls.' Opposition at 9), whereas the Government asserts that "claimants must provide notice of the factual basis for each claim they intend to pursue." (Reply Memorandum of Law in Further Support of the Motion of the United States for Summary Judgment and to Dismiss for Lack of Subject-Matter Jurisdiction ("Def.'s Reply"), ECF No. 67, at 2.) In the Second Circuit, a plaintiff's administrative tort claim "must provide enough information to permit the agency to conduct an investigation and to estimate the claim's worth." *Romulus v. United States*, 160 F.3d 131, 132 (2d Cir. 1998) (citing *Keene Corp. v. United States*, 700 F.2d 836, 842 (1983)). Here, the Government asserts that Plaintiffs failed to exhaust their medical malpractice claims stemming from the April 19 phone call because the SF95s "did not provide [DHHS] with any information about the [April 19]

8

claim" because Plaintiffs only "alleged that Mrs. Mejia's 'toxic shock' happened 'as a result of the tubal ligation,' which was performed on April 18, 2011, and that 'complications' occurred during the 'emergency surgery' that was performed on April 20, 2011." (Memorandum of Law in Support of the Motion of the United States for Summary Judgment and to Dismiss for Lack of Subject-Matter Jurisdiction ("Def.'s Moving"), ECF No. 58, at 17.) Plaintiffs contend, on the other hand, that DHHS was in a position to "examine[] MCHC's (including Dr. Allen's) 'entire response' to [Mrs. Mejia's] condition, including any response prior to her hospitalization on April 20, 2011 while in MCHC's continuing care." (Pls.' Opp. at 16.)

In light of the parties' arguments, the question for the Court to determine is whether the notice supplied in Plaintiffs' SF95s is sufficient to satisfy the presentment requirement in § 2675(a) specifically with regards to the April 19 claims. 28 U.S.C. § 2675(a). The legislative history of the FTCA indicates that the statutory purpose of the presentment requirement is "to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States." S.Rep.No. 1327, 89th Cong., 2d Sess. *reprinted in* (1966) U.S.Code Cong. & Ad. News, pp. 2515, 2516. This purpose will be served as long as "[the claim] provides enough information to permit such an investigation and a fair estimate of the claim's worth." *Kraut v. United States*, No. 86 C 1346, 1989 WL 29985, at *2 (E.D.N.Y. Mar. 22, 1989) (citing *Johnson by Johnson v. United States*, 788 F.2d 845, 848 (2d Cir. 1985)). *See also Rise v. United States*, 630 F.2d 1068, 1071 (5th Cir. 1980).

Accordingly, "[s]ection 2675(a) does not require formal pleadings or that a valid legal claim be alleged but only 'the basic elements of notice of accident and injury and a sum certain representing damages' so that the agency may investigate it." *Johnson by Johnson*, 788 F.2d at

9

849 (internal citation omitted). In *Johnson by Johnson,* the Second Circuit held that a claim form alleging sexual assault by a postal service employee was sufficient to put the agency on notice of a claim for negligent supervision. 788 F.2d at 849. The Court noted that, "[a]lthough the claim supplied no facts evidencing negligent supervision and did not allege all the factual elements of such a theory of liability, a reasonably thorough investigation of the incident should have uncovered any pertinent information in the government's possession relating to the agency's knowledge, or lack of knowledge, of any prior sexual misconduct by its employee." *Id.* As a result, "a claim may be sufficient even if it does not present the claimant's specific theories of liability or the *facts underlying those theories*." *Young v. United States,* No. 12-CV-2342 ARR SG, 2014 WL 1153911, at *8 (E.D.N.Y. Mar. 20, 2014) (emphasis added) (holding that where the plaintiff prisoner had filed an administrative claim for injuries suffered while in custody but the claim did not specify how he suffered those injuries (his cell mate attacked him), the administrative claim did not give the agency notice of a claim for negligence in assigning cell mates or responding to threats that were not mentioned in the administrative claim).

Plaintiffs' administrative claim met these requirements. By stating that Mrs. Mejia was admitted on April 18 and subsequently, *while in the continuing care of Dr. Allen*, admitted again on April 20, DHHS was put on notice to investigate the entire course of treatment, including any treatment that may have been given on April 19. Courts have held that a general medical malpractice allegation includes the hospital's and/or treating physician's whole response to the medical issue, including care prior to and after the specific treatment alleged. For example, in *Kraut v. United States,* the plaintiffs' claim stated that the nature of the injury was: "[p]ain & suffering—massive sepsis, Candida albicans yeast empyema, physical pain, emotional suffering, brain damage, cardiac arrest, 8/7/83–11/15/83. Wrongful death—occurred 11/15/83." No. 86 C

10

1346, 1989 WL 29985, at *2 (E.D.N.Y. Mar. 22, 1989). Under these circumstances, the court held that the agency was sufficiently on notice of claims regarding the entire course of treatment because "[t]he Hospital knew that the decedent had died after several operations and continuing treatment and can hardly have supposed that plaintiffs were deliberately restricting their claim to the initial operation." *Id.* The statement of the injury was "sufficient to advise the [agency] to be prepared to consider any damages the Hospital negligently inflicted right up to [the date of death]." *Id.* Similarly, in *Neuenswander v. United States*, the plaintiff was treated for a skin disease by a federal hospital for approximately 20 years, from 1983 to 2004. 422 F. Supp. 2d 425, 427-32 (D. Vt. 2006). The plaintiff's administrative claim alleged "negligent, reckless wanton failure to properly treat claimant's disease," and the government sought to preclude "all claims prior to 1998 because they were not properly presented to the agency." *Id.* at 437. The Court disagreed:

> Certainly, a reasonable investigation of [Plaintiff's] claim for the failure to properly treat his medical condition, which had been treated exclusively by the [federal hospital] for over twenty years, would include a review of his entire medical history with the [federal hospital] and thereby "uncover any pertinent information." The [federal hospital] was therefore reasonably on notice of the nature of [Plaintiff's] claim and had a reasonable opportunity to investigate his treatment history and other "closely related" matters.

*Id.* at 438 (citing *Burchfield v. United States*, 168 F.3d 1252, 1256 ("Section 2675(a) does not require an agency to undertake an independent search for injuries or theories of liability that are not closely related to the matters described in the claim.")) (internal citation omitted).

In the instant case, Mrs. Mejia had surgery performed by Dr. Allen on April 18 and suffered the catastrophic injuries on April 20. Additionally, DHHS was notified that Mrs. Mejia suffered these injuries while in the "continuing care" of Dr. Allen. (Exhibit A.) Under these

11

circumstances, it is reasonable to conclude that Plaintiffs' claim was sufficient to advise DHHS to consider any damages negligently inflicted during the two days leading up to the date of Mrs. Mejia's catastrophic injuries, and therefore, a reasonably thorough investigation of her claim should have included any malpractice that may have occurred from April 18 to 20.

The Government argues, however, that it was not put on notice of the April 19 claim because a reasonably thorough investigation of the incident would not reveal any information relating to Plaintiffs' new claim. (Def.'s Moving at 20.) The Court does not find this argument to be compelling. In *Johnson by Johnson*, the Second Circuit held that a reasonably thorough investigation should have uncovered any information relating to the agency's "knowledge, *or lack of knowledge*, of any prior [] misconduct." 788 F.2d at 849. Under the facts of *Johnson by Johnson*, if the employee had no history of sexual misconduct, the investigation would not have uncovered any information that would alert the agency of a negligent supervision claim. Nevertheless, the Second Circuit held that the claim was exhausted, because a reasonably thorough investigation could also uncover a lack of knowledge. 788 F.2d at 849. Similarly, in the instant case, the investigation should have covered the entire course of treatment, including April 19, and therefore would have uncovered a *lack of knowledge* of any treatment provided on that day. This would allow the Government to, at least, uncover "any information in [its] possession" to evaluate the claim.

In addition, the lack of knowledge may well be attributable to MCHC's misconduct. MCHC receptionists provided conflicting testimony as to how a telephone call such as Mrs. Mejia's would have been received or recorded. As a result, it is certainly possible that a receptionist transferred Mrs. Mejia to a nurse or doctor who did not record the message, or that the receptionist did not record the message because not every receptionist believed a message

should be recorded in this scenario. Therefore, Plaintiffs cannot be punished for what may have been a mistake or failure on the part of the Government.

Moreover, the Court is not persuaded that the Government is significantly prejudiced by Plaintiffs' failure to be more specific in their claims. The Government claims that it has been unable to secure phone records to demonstrate whether or not the call took place because Plaintiffs only produced one phone and testified that "potentially relevant phones have either been lost or discarded since 2011." (Def.'s Moving at 25.) But, Mrs. Mejia's medical record contains two telephone numbers that are confirmed numerous times in various laboratory testing reports and medical referral forms. (*See* Exhibit 13.) Once made aware of the claim, the Government was free to investigate the phone records associated with Mrs. Mejia's listed phone numbers and therefore cannot claim prejudice from its own failure to do so.[3] The Government's second claim of prejudice is that its staff would have had a better recollection had the Government been able to question them earlier (i.e., closer to the incident and alleged call). Though the Court is mindful of the prejudice that stems from fading witness' recollection, these witnesses are still available, and, in light of the Court's holding that the Government should have inquired as to any events that may have happened during the short treatment window, including April 19, the relevant on-call nurses and doctors could have been questioned in 2012.

Finally, the Court notes the special circumstances of this case in that Mrs. Mejia was no longer able to communicate after the alleged malpractice. As a result, she was unable to inform her attorney of any details as to the events of April 18-20 or, more specifically, that she called MCHC on April 19. Plaintiffs therefore experienced a significant barrier to accessing relevant

---

[3] While the Court acknowledges that not all phone companies keep records beyond three years, a number of companies do, and in any event, this does not undermine the fact that the Government's claim of prejudice from its alleged lack of knowledge as to the phone numbers is disingenuous.

13

information prior to filing the administrative claim. (Exhibit F at 19.) In light of the fact that a claimant is not required to plead every aspect of negligence on behalf of the Government but rather allege the treatment and injury so that the Government can investigate its potential liability, principles of fairness dictate that Plaintiffs should not have had to specifically allege the phone call to exhaust this "closely related" claim. *See Neuenswander*, 422 F. Supp. 2d at 438 (holding the agency was reasonably on notice of issues in plaintiff's treatment history and other "closely related" matters). Accordingly, the Government's motion to dismiss for lack of subject matter jurisdiction is denied.

## II.    *Lack of Informed Consent Claim*

Plaintiffs explicitly waived their informed consent claims, and, in any event, Plaintiffs have not provided any evidence to support these claims. In their opposition to the current motions, Plaintiffs explain that they "do not assert lack of informed consent as concerns the actual April 18th and April 20th surgeries" but maintain a cause of action for "lack of informed consent in failing to warn of the risk of life-threatening infection as a result of the elective non-emergent tubal ligation." (Pls.' Opposition at 1.) These statements, however, are irreconcilable. Under New York law, a "patient may recover for injuries she suffered *as a result of the procedure or examination* if the doctor failed to obtain her informed consent." *Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 133 (2d Cir. 2005) (emphasis added). Specifically, "[t]he right of action to recover for medical ... malpractice based on a lack of informed consent is limited to those cases involving either (a) non-emergency treatment, procedure or surgery, or (b) a diagnostic procedure which involved invasion or disruption of the integrity of the body." N.Y. Pub. Health Law § 2805-d. Plaintiffs' claim for lack of informed consent, therefore, must be based on a *treatment, procedure, or surgery* performed on Mrs.

Mejia. Plaintiffs' assertion that Mrs. Mejia was not warned of the risk of life-threatening infection goes to her consent as to the tubal ligation surgery. Mrs. Mejia's consent is only required for the surgery and treatment, and although her consent must be given after being informed of all the risks—including the risk of infection—a patient does not consent to the risk but to the procedure itself. Accordingly, Plaintiffs' claim of lack of informed consent is inapposite. In light of the fact that Plaintiffs waived any informed consent claim based on the actual surgeries, Plaintiffs cannot maintain such a claim.[4]

In any event, Plaintiffs have not provided any evidence to support a claim for lack of informed consent. The Government submits two consent forms signed by Mrs. Mejia acknowledging that she had been fully informed of the potential "complications" and "risks" associated with the procedure. Plaintiffs' assert that this is insufficient because the forms do not address the risk of infection. (Pls.' Opposition at 21.) However, the forms do not specify any individual risk; the patient simply signs the forms acknowledging that she has been informed separately of *all* the potential risks. Therefore, the consent forms—without any evidence from Plaintiffs proving the existence of a dispute on the issue—dispel any notion that Mrs. Mejia was not fully informed prior to the surgery and foreclose Plaintiffs' informed consent claim.[5]

### III. *Negligent Exposure Claim*

Plaintiffs argue that "the Government's motion for summary judgment is premature and should be denied" because they are awaiting discovery from ORMC regarding Mrs. Mejia's

---

[4] *See* Exhibit F at 6-7 ("THE COURT: . . . Did you abandon the lack of informed consent with respect to the actual procedure, the tubal ligation? MR. COOK: Yes, your Honor.").

[5] This conclusion is unaffected by any further discovery from ORMC.

15

exposure to Group A strep. (Pls.' Opposition at 20-22.) Federal Rule of Procedure 56, which governs motions for summary judgment, provides in relevant part that:

> (d) [] If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > (1) defer considering the motion or deny it;
> > (2) allow time to obtain affidavits or declarations or to take discovery; or
> > (3) issue any other appropriate order.

Fed. R. Civ. P. 56. The Second Circuit clearly requires that the Rule 56(d) affidavit or declaration "include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994) (discussing prior version of the rule) (citing *Hudson River Sloop Clearwater, Inc. v. Department of Navy*, 891 F.2d 414, 422 (2d Cir.1989); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir. 1985).) Plaintiffs' declaration explains that they are awaiting "a schematic of the hospital facility as it existed on April 18, 2011 and the rooms, including operating rooms and treatment locations of the concurrently treated Strep A patients and their whereabouts within the Hospital shortly prior to and/or on April 18, 2011 in relation to the location where Plaintiff Mejia was treated, underwent surgery and the room(s) she occupied until discharge." (Declaration of David C. Cook, ECF No. 66, ¶ 14.) The declaration asserts—and the exhibits confirm—that Plaintiffs' counsel has requested this discovery from ORMC's counsel and has continued to follow up regarding its production. (*Id.*; Exhibit 31.) Finally, the declaration states that "[t]his discovery is germane to whether ORMC and doctors using ORMC facilities (including Dr. Allen) followed

16

proper infectious disease protocol and whether any cross contamination with Mrs. Mejia occurred on April 18, 2011." (Declaration of David C. Cook, ¶ 15.) Accordingly, Plaintiffs have demonstrated that outstanding discovery exists that may create a genuine issue of material fact as to whether Mrs. Mejia was negligently exposed to Group A strep, and this motion is premature on this claim. The Court will therefore not consider the Government's motion for summary judgment with regard to the negligent exposure claim.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion for to dismiss for lack of subject matter jurisdiction, GRANTS the Government's motion for summary judgment on Plaintiffs' informed consent claims, and DENIES the motion for summary judgment on the negligent exposure claim. Accordingly, the Clerk of the Court is respectfully directed to terminate the motion at ECF No. 56.

Dated: August 31, 2016  
       White Plains, New York

SO ORDERED:

_____  
NELSON S. ROMÁN  
United States District Judge

17